**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**MATTHIAS LEGUIRE,**

Plaintiff,

v.

**ERIK ADKINS, et al.,**

Defendants.

CASE NO. 3:23 CV 1123

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Pending before the Court is Defendants' Motion for Summary Judgment on *pro se* Plaintiff Matthias Leguire's Fourth Amendment claim—the sole remaining claim in this action brought pursuant to 42 U.S.C. § 1983. (Doc. 62). Plaintiff opposed (Doc. 64) and Defendants replied (Doc. 67). Jurisdiction is proper pursuant to 28 U.S.C. § 1331. For the reasons stated below, the Court denies Defendants' Motion.

## BACKGROUND

Factual Background

This case stems from a dispute between Plaintiff and Findlay city officials regarding Plaintiff's storage of a boat, van, and trailer on his property located at 830 E. Sandusky Street in Findlay, OH. (Doc. 62-2, at 2); (Doc. 64-2, at 2). On May 11, 2023, Defendant Joe Smith, an Officer with the Findlay City Police Department, received a copy of a nuisance complaint submitted via the City's online reporting portal. (Doc. 62-2, at 2, 11–12). The complaint described "an inoperable boat, trailer and farm wagon" situated towards the rear of Plaintiff's property and claimed these vehicles were visible through a "broken down fence" on the property. *Id.* According

to Defendant Erik Adkins, it is "typical procedure" for Findlay City Police Officers to investigate civil nuisance complaints. (Doc. 62-1, at 3–4).

*May 22, 2023*

What occurred next remains in dispute. In his affidavit, Plaintiff claims he received a call from Officer Smith on May 22, 2023, explaining the nature of the complaint and notifying Plaintiff that Smith "needed to come to [his] house to check for violations." (Doc. 64-2, at 4). Plaintiff avers he told Officer Smith during the call he did not have permission to enter his property without a warrant and would be limited to viewing his property from a public sidewalk or other public vantage point. (Doc. 64-2, at 4). Officer Smith replied the complaint was "criminal" in nature, meaning he "needed to enter and search [Plaintiff's] property to see if the complaint was valid" despite Plaintiff's objections. *Id.* Officer Smith's affidavit contains no mention of this phone call.

It is undisputed that Officer Smith, alongside Defendant David Hill, a Lieutenant with the Findlay City Police Department, and Defendant Erik Adkins, a City of Findlay Zoning Administrator, went to Plaintiff's property on May 22, 2023. (Doc. 62-2, at 2); (Doc. 64-2, at 4). The trio pulled into Plaintiff's driveway and made initial contact. (Doc. 62-2, at 2); (Doc. 64-2, at 4). Plaintiff claims he then repeatedly protested the Defendants' presence on his property, instructing them "at least five times" to leave. (Doc. 64-2, at 4). Plaintiff then instructed Defendants they could view his property from the sidewalk or other public land, and claims he advised Defendants they did not have permission to enter his property without a warrant. *Id.* Plaintiff further describes a phone call with Thomas Ross, a non-party to this suit, which occurred during Defendants' arrival to his property. *Id.* Attached to Plaintiff's opposition brief is Ross's sworn affidavit, wherein he states he personally overheard Plaintiff speaking with Defendants and notifying them they were not permitted to enter his property without a warrant. (Doc. 64-2, at 24).

Further, Ross claims to have overheard Defendants respond by stating "they did not need a warrant because they were investigating alleged 'criminal violations.'" *Id.*[1]

At some following Defendants' arrival, Plaintiff began recording this initial encounter with his cell phone. (Doc. 62-2, at 2–3); (Doc. 64-2, at 5); (Doc. 63) (notice of manual filing of video exhibits A-2–A-8 attached to Adkins' affidavit). These videos do not evidence Plaintiff's statements to Defendants' regarding their general permission (or lack thereof) to enter onto his property. *See generally* Exs. A-2, A-3. Defendants' affidavits describe Plaintiff as being "initially resistant" to their presence on his property before "basically acquiesc[ing]" thereto. *See, e.g.*, Doc. 62-3, at 3; Doc. 62-2, at 3.

The video footage does depict Plaintiff specifically objecting to Adkins's presence on his property, as Plaintiff can be heard stating "I'd actually prefer you left my property right now, Erik." (Ex. A-3, at 0:05-:13).[2] Defendant Adkins complies. *See* Doc. 62-1, at 4–5 ("[Plaintiff] would not permit me to accompany [Smith and Hill]. I honored that request . . . and I never went any further

1. Were Ross to testify as to this conversation he overheard, such testimony would be admissible either to demonstrate the effect of Plaintiff's statements on the Defendants or the effect of Defendants' statements on Plaintiff, not for the truth of the statements. *See* Fed. R. Evid. 801(c)(2). The former would be relevant to whether the Defendants reasonably understood Plaintiff to have consented to the search, while the latter would be relevant to whether Plaintiff felt coerced into allowing Defendants onto his property. These concepts are discussed further *infra*. Ross's testimony regarding Defendants' statements during this conversation would also likely be admissible as the statement of a party opponent. *See* Fed R. Evid. 801(d)(2). The same cannot be said for Ross's potential testimony regarding Plaintiff's statement that he "told Officer Smith that he could look for any alleged violations from the public sidewalk and then send notice by mail, but that he was not permitted to enter his property without a warrant." (Doc. 62-2, at 24); *see also* Doc. 67 at 4 (arguing certain portions of Ross and Plaintiff's affidavits constitute inadmissible hearsay). This out of court statement by Plaintiff, as relayed through Ross's potential testimony, is relevant only to the extent it is true. That is, it is only relevant to the extent Plaintiff did in fact tell Smith over the phone he could not enter without a warrant.

2. In support of their Motion for Summary Judgment, Defendants do not offer any defendant-specific arguments. Accordingly, the Court does not conduct separate search and consent analyses for each Defendant.

than [Plaintiff's] driveway where we had all been standing during the initial conversation."). After the initial encounter on the driveway, Plaintiff then proceeds to walk towards the rear of his property alongside Smith and Hill. *Id.* at 0:12-:20; Ex. A-4, at 0:01-2:22. The group then arrives at the far rear of Plaintiff's property, where the boat which was the subject of the nuisance complaint and Plaintiff's fence can be seen on video. Ex. A-4, at 2:40-4:10. Once beside the boat, Officer Smith and Plaintiff discuss the boat's status, with Plaintiff claiming the boat serves as a "kid's fort" and is not a junk vehicle. *Id.* at 2:40–3:30. Lieutenant Hill can then be seen inspecting the front of Plaintiff's boat and filling out paperwork. *Id.* at 4:15–5:56.

The recording continuously depicts a gap in Plaintiff's fence adjacent to the boat; at one point, Plaintiff and Lieutenant Hill step through this gap to discuss Plaintiff's property line and related matters. *Id.* at 6:10–7:40.[3] After Plaintiff steps back through what he describes as his "damaged" fence, the video shows a bright-orange sticker affixed to his boat. (Ex. A-5, at 0:11–:31). This sticker is the City of Findlay's "Must Move Vehicle" notice, which Smith attached to the boat after determining its trailer lacked a valid registration and both the boat and trailer met the definition of a "junk" or "inoperable" vehicle. *See* Doc. 62-2, at 5; *id.* at 21 (depicting a blank copy of the notice sticker affixed to Plaintiff's boat).[4] The sticker indicates any failure to remove the junk vehicles from the relevant property "may result in the vehicle[s] being impounded" and criminal charges. *Id.* at 21. After further discussion regarding the boat, the group begins to return to the front portion of Plaintiff's property in the general direction of his residence. (Ex. A-5, at 1:53–3:59).[5] Lieutenant Hill then approaches a minivan on Plaintiff's property, which Plaintiff

---

3. In a later video, Plaintiff admits unspecified "perverts" and "peeping Toms" are able to see "right through" the gap in his fence. (Ex. A-7, at 4:01-:16).
4. Plaintiff does not dispute the boat and trailer's unregistered status. *See* Doc. 64, at 2–4.
5. Perhaps in an attempt to bolster their due process argument, discussed further *infra*, Defendants identify multiple instances during the conversation between Lieutenant Hill and Plaintiff around

claims he uses to store food. (Ex. A-6, at 0:06–:37). Much like with the boat, Lieutenant Hill can be seen inspecting the van and completing paperwork. *Id.* at 0:40–3:55. Lieutenant Hill then affixes an orange "Must Move Sticker" onto the windshield of the van. *Id.* at 4:12–:20; (Ex. A-7, at 0:01–:09). The trio returns to Plaintiff's driveway and continues discussing the status of Plaintiff's vehicles, the complaint made against the same, and his options to abate the alleged nuisance. (Ex. A-7, at 1:53–4:23).

While not depicted on video, Hill and Smith then left Plaintiff's property. (Doc. 64-2, at 5). Shortly thereafter, Plaintiff claims he contacted the Hancock County Sheriff, the Hancock County Prosecutor, the City Law Director, and the City Police Department to lodge complaints regarding Defendants' entry onto his property. *Id.* Plaintiff did not remove the boat and van from his property or attempt to register the vehicles after this encounter with Defendants. *Id.*; Doc. 62-2, at 7–8.

*May 30, 2023*

At some point on May 30, 2023, Officer Smith returned to Plaintiff's property. (Doc. 62-2, at 8); (Doc. 64-2, at 5). Again, the exact unfolding of events is hotly contested. Officer Smith claims he viewed the boat and trailer through the fence at the rear of Plaintiff's property despite the fence having been fixed prior to his arrival. (Doc. 62-2, at 8). On his account, Officer Smith then knocked on the front door of Plaintiff's residence and rang the doorbell multiple times. *Id.* After receiving no answer, Smith entered the rear of Plaintiff's property wherein he noted the boat, trailer, and van still had no valid registration. *Id.* Accordingly, because Plaintiff had neither

---

the boat wherein Lieutenant Hill advises Plaintiff of how he could abate the alleged nuisance without further involvement from the City. *See* Doc. 62, at 12–13.

registered nor removed what the City deemed to be "abandoned" or "junk" vehicles, Smith called Dick's Towing company to effectuate removal. *Id.*

Contrarily, Plaintiff avers Officer Smith could not have knocked or rang his front doorbell to give notice of his presence, as Plaintiff's entire family was at home that day and heard nothing. (Doc. 64-2, at 5). Plaintiff claims he had no notice whatsoever of Smith's arrival on his property and first realized what was transpiring when he "discovered a tow truck on [his] property removing [his] minivan, with several officers standing by." *Id.* Plaintiff further discovered his boat and trailer had already been towed. *Id.* Plaintiff disputes Officer Smith's account of how he viewed the boat and trailer through the fence. Specifically, Plaintiff claims Officer Smith's initial report of the events of May 30 "falsely stated that [Plaintiff's] fence had not been fixed and that he could see the boat through a hole. In fact, the fence had been repaired nearly a week earlier." *Id.* As evidence of Officer Smith's alleged misrepresentation, Plaintiff points to the fact that, after he accused Officer Smith of lying on Facebook, the latter filed a supplemental report the next day "now claiming he could see the boat through cracks in the fence." *Id.* The documents attached to Plaintiff's opposition brief reflect this change, as Officer Smith wrote in his May 31 supplemental report that, contrary to his initial report, "[t]he fence was fixed prior to my arrival at [the property]. With the fence repaired I still could see the boat through the cracks." *Id.* at 21–23.

The Parties agree Plaintiff attempted to arrest the towing of his van by placing himself between it and the tow truck. *Id.* at 5; Doc. 62-2, at 9. Plaintiff moved aside after Officer Smith threatened to arrest him for obstruction of official business. (Doc. 62-2, at 8–9); (Doc. 64-2, at 5). Plaintiff also attempted to arrest the towing of his vehicles by calling the Hancock County Sheriff on Officer Smith for trespassing. (Doc. 62-2, at 8–9); (Doc. 64-2, at 5). After these attempts failed, Officer Smith and Dick's Towing successfully removed the van from Plaintiff's property and

placed it, alongside the boat and trailer, in the Dick's Towing impound lot. (Doc. 62-2, at 8–9); (Doc. 64-2, at 6).

At no point throughout this entire saga did Defendants obtain a warrant to search Plaintiff's real property or to seize his van, the boat, and the boat's trailer.

Procedural Background

Plaintiff originally brought multiple claims in this § 1983 action for Fourth Amendment violations, deprivation of property without due process under the Ohio and United States Constitutions, and equal protection violations; state law tort claims for replevin, conversion, civil conspiracy, invasion of privacy, trespass, intentional and negligent infliction of emotional distress; as well as various *Monell* claims against the City of Findlay and those acting on its behalf in an official capacity. *See generally* Doc. 1. Motion practice followed, with the Court[6] ultimately dismissing all but Plaintiff's Fourth Amendment Claim against Defendants Smith, Hill, and Adkins as plead in Plaintiff's Second Amended Complaint. *See* Doc. 41, at 12 (Second Amended Complaint); Doc. 54, at 7 ("I conclude that Defendants Lt. Hill, Officer Smith, and Zoning Officer Adkins are not entitled to have their instant Motion granted. I will, for now, allow the case to proceed against them to determine whether the warrantless search and ultimate seizure of Plaintiff's van and boat were unlawful."). The Court found Plaintiff plead a plausible Fourth Amendment claim because both the May 22 and May 30 warrantless search and seizure, "arguably occurred within the curtilage of Plaintiff's house, an area in which Plaintiff had an expectation of privacy." *Id.* at 6–7.

6. This case was originally assigned to District Judge James G. Carr. On April 16, 2025, this case was reassigned to the undersigned.

Importantly, the Court, and now the parties, assumed Plaintiff's Second Amended Complaint alleged two separate Constitutional violations: one related to the Defendants' entry onto and inspection of his property, and another related to the warrantless entry to seize of his boat, van, and trailer. *See* Doc. 54, at 7; Doc. 62, at 24–27 (arguing both that Plaintiff "basically acquiesced" to a search of an "open field" on his property during Defendants' "May 22, 2023 personal visit" and that "[Officer] Smith's warrantless entry onto [Plaintiff's] property on May 30, 2023, to impound [Plaintiff's] van and boat . . . did not constitute an unreasonable search or seizure"). This is the case despite Plaintiff's Second Amended Complaint only specifically alleging a violation stemming from the May 30, 2023, removal of his boat, van, and trailer. *See* Doc. 41, at 12 ("Plaintiff alleges that the seizure of his vehicles was executed without a warrant, probable cause, or any lawful justification, thereby infringing upon [Plaintiff's] Fourth Amendment rights against unreasonable searches and seizures."). Thus, given the joint decision to treat Plaintiff's Second Amended Complaint as alleging two separate Fourth Amendment Violations, as well as the liberal treatment afford *pro se* pleadings, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Court will assess whether Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment claim stemming from both the May 22 and May 30, 2023, encounters.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any factual matter in dispute; the Court determines only whether the case contains

sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials"). In deciding whether the parties meet their respective burdens, the Court may only consider evidence which can be authenticated and presented in an admissible form at trial. Fed. R. Civ. P. 56(c)–(e); Fed. R. Evid. 901.

## DISCUSSION

To establish an actionable violation of his rights pursuant to § 1983, Plaintiff must demonstrate: "1) the deprivation of a right secured by the Constitution or laws of the United States and 2) [that] the deprivation was caused by a person acting under color of state law." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005)). Here, Defendants do not contest they acted "under color of state law"— meaning they "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Thus, this Court must only determine if Defendants are entitled to summary judgment on the issue of whether they individually deprived Plaintiff of his Fourth Amendment rights.

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The basic purpose of this Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (citation modified). The Fourth Amendment thus requires the Court to answer two questions. First, did the Defendants conduct a search or seizure of Plaintiff's property? "If so, was the search reasonable?" *Mockeridge v. Harvey*, 149 F.4th 826, 833 (6th Cir. 2025).

Whether a "search" has occurred within the meaning of the Fourth Amendment is rooted primarily in the reasonable expectations of the individual subject to the government action. Specifically, "'[w]hen an individual seeks to preserve something as private and his expectation of privacy is one that society is prepared to recognize as reasonable,' then governmental 'intrusion into that private sphere generally qualifies as a search.'" *Chatrie v. United States*, 609 U.S. ---, 2026 WL 1855568, at *8 (2026) (slip op.) (quoting *Carpenter*, 585 U.S. at 304). The quintessential government search occurs when "law enforcement officials 'obtain[] information by physically intruding'—that is, trespassing—on private property" *Id.* (quoting *United States v. Jones*, 565 U.S. 400, 406–07 n.3 (2012)). A Fourth Amendment seizure occurs whenever a state actor meaningfully interferes with an individual's possessory interest in their real or personal property. *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016). And a warrantless search or seizure is "per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions" including the consent of the searched. *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

As with the factual background of this case, the Court will divide its analysis between the events of and arguments surrounding the May 22 and May 30, 2023, encounters between Plaintiff and Defendants.

May 22, 2023

Defendants offer two primary arguments justifying their initial warrantless entry onto Plaintiff's property to inspect his boat, van, and trailer. First, they claim all three items were outside the "curtilage" of Plaintiff's residence and instead resided in an "open field" on the property. *See* Doc. 62, at 25. If Defendants are correct on this point, they claim their initial entry onto Plaintiff's property did not constitute a "search" under the Fourth Amendment as there is no reasonable expectation of privacy regarding objects located in open fields. *See Widgren v. Maple Grove Twp.*, 429 F.3d 575, 579–80 (6th Cir. 2005). Second, Defendants assert that, even if they conducted a search on Plaintiff's property, Plaintiff consented thereto. *See* Doc. 62, at 25–26 ("Based on [Plaintiff's] exchange with Off. Smith and Lt. Hill . . . Defendants submit a reasonable person would have understood that [Plaintiff] consented to the search of the boat and van on his property."). The Court addresses each argument in turn.

*Curtilage & Open Fields*

"The term 'open fields' is somewhat of a misnomer in that '[a]n open field need be neither "open" nor a "field"' and 'may include any unoccupied or undeveloped area *outside of the curtilage*.'" *Widgren*, 429 F.3d at 579 (emphasis added) (quoting *Oliver v. United States*, 466 U.S 170, 180 n.11 (1984)). That is, as Plaintiff identifies, *see* Doc. 64, at 8–9, being outside the curtilage of the home is a necessary precondition to a portion of the property constituting an open field. "The curtilage—the area 'immediately surrounding and associated with the home'—is treated as 'part of [the] home itself for Fourth Amendment purposes.'" *Morgan v. Fairfield Cnty.*, 903 F.3d

553, 561 (6th Cir. 2018) (quoting *Oliver*, 466 U.S. at 180).[7] Whether a particular area of one's property is considered curtilage is a "fact-intensive analysis" involving four factors: "(1) the proximity of the area to the home[;] (2) whether the area is within an enclosure around the home[;] (3) how [the] area is used[;] and (4) what the owner has done to protect the area from observation by passersby." *Id.* (citing *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

In ruling on Defendants Motion to Dismiss, the Court previously found Plaintiff's boat, trailer, and van to be "arguably" within the curtilage of his home. *See* Doc. 54, at 6–7. Now, at summary judgment, Defendants have not convinced the Court otherwise. Specifically, Defendants have not demonstrated the absence of genuine, material factual dispute regarding whether the boat, van, and trailer were within the "curtilage" of Plaintiff's residence under the *Dunn* factors.

First, it is unclear exactly how far from Plaintiff's home the van and boat were located. While it took Plaintiff and Defendants Smith and Hill well over a minute to walk to the boat and trailer located in the rear of Plaintiff's property, *see* Ex. A-4, at 2:40-4:10, neither side in this litigation offers a firm estimate of the distance from Plaintiff's home to the boat and trailer. *See* Doc. 62, at 25 ("[T]he boat and trailer were located at the far rear of the property."); Doc. 64, at 9 ("[T]he vehicles were not parked immediately against the house."). After Officer Smith inspects Plaintiff's boat and trailer, the group appears to walk back in the general direction of Plaintiff's home in order to inspect the van. *See* Ex. A-5, at 1:53–3:59. It is not at all clear from the video or

---

7. Of course, individuals can retain a constitutional privacy interest in a shelter or piece of personal property (an "effect") which is itself located in an open field. *See, e.g.*, *United States v. Basher*, 629 F.3d 1161, 1169 (9th Cir. 2011) (explaining individuals retain a reasonable expectation of privacy with respect to the inside of their tent placed at a campsite, but not in the area surrounding it, as campsites are generally "dispersed," "ill-defined," and "open to the public and exposed"). Here, however, Defendants merely needed to inspect the exterior of the van and boat for valid registration, which would be readily visible to the public were such vehicles to be located in an open field.

the Parties' submissions to the Court how far away the van is located from Plaintiff's home. This lack of clarity cuts against Defendants' Motion, as they bear the burden to demonstrate the absence of facts supporting Plaintiff's Fourth Amendment claim. In any event, proximity alone often bears comparatively little weight on the curtilage analysis, as "there is no 'fixed distance at which curtilage ends.'" *Mockeridge*, 149 F.4th at 834 (quoting *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598–99 (6th Cir. 1998)).

Second, Plaintiff puts forth affirmative evidence demonstrating the areas of his property containing the boat, trailer, and van were "enclosed" along with the home by either man-made or natural barriers. The boat is enclosed by a privacy fence which, at various times during the submitted videos, appears to enclose the entirety of the rear of Plaintiff's property as well as Plaintiff's residence. *See* Ex. A-4, at 6:10–7:40. Similarly, the van appears to be enclosed on at least one side by a dense "natural wooded barrier." (Doc. 64, at 9); Ex. A-6, 0:40–3:55. Given the position of the van relative to the boat, it is likely the van is also enclosed by the privacy fence running along the backside of Plaintiff's property. Viewed in a light most favorable to Plaintiff, it is at least plausible on the evidence currently before the Court the van, boat, and his residence are surrounded on at least three sides by common operation of the privacy fence and natural wooded area. *See Daughenbaugh*, 150 F.3d at 599 (considering "heavy tree coverage" as part of the home's enclosure because "requiring a person to expend resources and sacrifice aesthetics by building a fence in order to obtain protection from unreasonable searches is not required by the Constitution" (quoting *Williams v. Garrett*, 722 F. Supp. 254, 261 (W.D. Va. 1989)). Defendants do not contest the veracity of the evidence Plaintiff invokes on this point.

Third, the nature of the use of the property cuts in favor of Plaintiff. A jury would be entitled to credit any testimony Plaintiff offers to reaffirm the assertions he made to Officer Smith

and Hill regarding the boat being used as a "kid's fort" for his children to play on. Ex. A-4, at 2:40–3:30. Similarly, a jury could find credible Plaintiff's assertion the van was used to store food for his family, and that the areas surrounding the boat, van, and trailer were used for gardening. *See* Doc. 64, at 9; Doc. 64-2, at 6. Viewing the facts in a light most favorable to Plaintiff, food storage, gardening, and providing children with a place to play all constitute "activities associated with the privacies of domestic life." *Daughenbaugh*, 150 F.3d at 600 (quoting *United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir. 1993)); *see Hardesty v. Hamburg Twp.*, 461 F.3d 646, 652–53 (6th Cir. 2006) ("The presence of space for gardening and hanging laundry out to dry has also been found to weigh in favor of finding an area to be curtilage." (citing *Jenkins*, 124 F.3d at 773)), *abrogated on other grounds as recognized by Bey v. Falk*, 946 F.3d 304, 317 (6th Cir. 2019).

Fourth and finally, the effort taken to protect the relevant areas of Plaintiff's yard counsels in favor of deeming it curtilage. All that is necessary for Plaintiff to make his case under the fourth *Dunn* factor is for the boat, trailer, and van to be shielded from passersby traveling on public thoroughfares. *See id.* at 653. At the very least, the van and trailer's location at the rear of Plaintiff's property, which is itself "a good distance from the road and . . . quite obviously[] behind the house," necessarily shields it from the view of the public traveling on the road to the front of Plaintiff's house. *Jenkins*, 124 F.3d at 773. While Plaintiff's neighbors may have been able to see through the gap in the fence adjacent to the boat, this does not strictly weigh against finding the area to be curtilage. *See Hardesty*, 461 F.3d at 653 ("An area can be curtilage even where neighbors have a view of the area.").[8] While it is further unclear from the record whether the van, which was

8. While Plaintiff admits there is a public right of way somewhere in the vicinity of his property line, *see* Doc. 64-2, at 6, nothing in the record suggests the area surrounding the boat, trailer, and van were visible therefrom on account of the fence's gap. Additionally, Plaintiff introduced evidence he repaired the gap in the fence prior to the May 30, 2023 entry onto his property, further bolstering his curtilage argument at least with respect to this second purported search. *See id.* at 5.

located closer to the front of Plaintiff's property, was visible from the road in front of Plaintiff's house, nothing in the record establishes the areas surrounding the boat, van, and trailer were all visible from the road or any other public vantage point. If anything, viewing the evidence in a light most favorable to Plaintiff, this fourth factor cuts in his favor.

Nor is the Court persuaded by Defendants invocation of *Widgren* for the proposition that "a regulatory search is less intrusive than a criminal search" even where such search intrudes onto the curtilage of the home. *See* Doc. 62, at 19 (citing *Widgren*, 429 F.3d at 583–85). For one, the search in *Widgren* involved the inspector entering the curtilage to view aspects of the building which were also in plain view from public vantage points. *Widgren*, 429 F.3d at 585–86. Additionally, as recognized in *Mockeridge*, "*Widgren*'s rationale likely does not survive the Supreme Court's reinvigoration of the property-based approach, under which a search occurs when a government official 'physically intrudes on the curtilage to gather evidence.'" *Mockeridge*, 149 F.4th at 835 (quoting *Collins v. Virginia*, 584 U.S. 586, 593 (2018)).

Even after failing to carry their burden to demonstrate the areas around Plaintiff's boat, trailer, and van were outside the curtilage of his home and thus in an "open field" as a matter of law, Defendants may still prevail on summary judgment if they establish Plaintiff consented to the May 22, 2023, search of his property.

*Consent*

Consent in the Fourth Amendment context operates as an affirmative defense. That is, once a § 1983 plaintiff demonstrates a search occurred, "[t]he burden to establish that the exception applies is on the officer invoking consent." *Andrew v. Hickman Cnty.*, 700 F.3d 845, 854 (6th Cir. 2012). The officials who conducted the search must demonstrate it was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*,

569 F.3d 597, 602 (6th Cir. 2009). "Whether these requirements were met 'is a question of fact to be determined from the totality of all the circumstances.'" *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Summary judgment is thus proper only where all reasonable juries would conclude Plaintiff consented according to the requirements outlined in *Canipe*.

Defendants, in both their Motion and respective affidavits, contend Plaintiff "basically acquiesced to the officers being" on his property "once [Officer] Smith advised [Plaintiff] they were there to investigate a complaint of junk vehicles." (Doc. 62, at 25); *accord* Doc. 62-1, at 4; Doc. 62-2, at 3; Doc. 62-3, at 3. But "mere acquiescence does not suffice to establish free and voluntary consent." *United States v. Moon*, 513 F.3d 527, 538 (6th Cir. 2008). The individual subject to the search must instead offer some "affirmative statement[] indicating free and voluntary consent." *Canipe*, 569 F.3d at 603. And Defendants point to no such affirmative grant of consent. Rather, their acquiescence argument hinges on Plaintiff's decision to walk with Smith and Hill to the rear of his property and discuss the matter of his boat and van with them. *See* Doc. 62, at 25–26 ("[Plaintiff] then walked with [Smith and Hill] to view the boat and trailer, and then the van. . . . Based on [Plaintiff's] exchange with [Smith and Hill] . . . Defendants submit a reasonable person would have understood that [Plaintiff] consented to the search of the boat and the van on his property."); Ex. A-4, at 0:01–4:10. But merely following officers and discussing the subject of the search—even if fairly described as "acquiescence"—is insufficient to establish consent, particularly where such actions may fairly be construed as "an expression of futility in resistance to authority." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). And a jury would be entitled to credit testimony from Plaintiff reflecting the assertion in his affidavit that he personally felt "coerced" into ceasing his objections to their search because of the Defendants' assertions regarding the criminal nature of their investigation and Plaintiff's own prior run-ins with the police.

(Doc. 64-2, at 4–5); *see* Fed. R. Civ. P. 56(c)(4) (explaining an affidavit may be considered on a motion for summary judgment where "the affiant or declarant is competent to testify on the matters stated"). The Officers' statements in this context would be admissible either for purposes unrelated to their truth, specifically to demonstrate their effect on Plaintiff, or as the statement of a party opponent. *See* Fed. R. Evid. 801(c)(2)–(d)(2).

A jury would also be entitled to credit testimony from Plaintiff regarding his repeated statements to Defendants affirmatively and unequivocally *denying* consent to search his property. *See* Doc. 64-2, at 4 (stating Plaintiff told Officer Smith over the phone he "could not enter [his] property without a warrant" and reiterated this denial of consent by "telling [Defendants], at least five times, to get off [his] property" after their arrival"). Again, Plaintiff's testimony recounting these out of court statements would be admissible to the extent it demonstrates their effect on Defendants and their understanding of his consent (or lack thereof) to the search. *See* Fed. R. Evid. 801(c)(2). And the natural and reasonable effect of Plaintiff's statements on Defendants is the core of the consent inquiry, as "[t]he standard for measuring the scope of [an individual's] consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [individual]?" *United States v. Henry*, 429 F.3d 603, 616 (6th Cir. 2005) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). The same is true with respect to Thomas Ross's assertion he overheard Plaintiff repeatedly tell Defendants they "were welcome to view his property from the street or sidewalk, but that they were not permitted to enter onto his private property without a warrant." (Doc. 64-2, at 24); *see supra* n.1 and accompanying text.

In sum, Defendants fail to carry their burden to demonstrate the absence of a material fact with respect to Plaintiff's consent to the initial search of his property. As Defendants seemingly

concede, Plaintiff was "initially resistant" to the search, *see* Doc. 62, at 25; Doc. 62-2, at 3, and, viewing the evidence in a light favorable to Plaintiff, *at most* merely acquiesced to the search of his property. *See Worley*, 193 F.3d at 386. And because Defendants similarly failed to demonstrate the May 22, 2023 search occurred in an "open field" to which no reasonable expectation of privacy attached, they are not entitled to summary judgment on Plaintiff's Fourth Amendment claim with respect to such search.

<u>May 30, 2023</u>

In support of the second warrantless entry onto Plaintiff's property by Officer Smith "to impound [Plaintiff's] van and boat," Defendants invoke Sixth Circuit precedent permitting public officials to seize property "that has been declared a public nuisance" so long as "the property owner has been provided constitutionally adequate due process" in connection with deeming the property a nuisance.[9] *See* Doc. 62, at 27–28 (first citing *Gammarino v. Sycamore Twp.*, 2025 WL 674222 (6th Cir.); and then citing *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306 (6th Cir. 2021)). As a result, Defendants assert because Plaintiff "received adequate due process" through the posting of the notices on each vehicle which "advised [Plaintiff] he could call the indicated number[] and schedule a verification of the vehicles' status," the warrantless entry onto his property and seizure of the vehicles was reasonable. *Id.* at 27.

Defendants overstate the holding of *Widgren* and *Keene Group*. In the latter, the court drew from decisions of the Fifth and Tenth Circuits holding no warrant was required to enter onto

---

9. Defendants do not contend Officer Smith's entry onto Plaintiff's property in connection with the May 30, 2023, towing of his boat and van did not constitute a "search or seizure" under the Fourth Amendment. Rather, they contend such search or seizure was not *unreasonable* in light of the vehicles' location in an "open field" and the nuisance declaration procedures comporting with constitutional due process. *See* Doc. 62, at 27–28. The same open field analysis conducted with respect to the May 22, 2023 entry applies here, as there is no indication the vehicles were moved prior to the second entry.

individual's property to seize their personal property which "'has been declared a public nuisance by means of established police power procedures' *in the absence of a constitutionally protected privacy interest*." *Keene Grp.*, 998 F.3d at 315 (emphasis added) (quoting *Freeman v. City of Dallas*, 242 F.3d 642, 644–45 (5th Cir. 2001)); *accord id.* at 316 ("No court has interpreted the Supreme Court's decision in *Michigan v. Tyler*, 436 U.S. 499 (1978) to require a warrant in an administrative public nuisance abatement case *in the absence of a reasonable expectation of privacy*." (citation modified)). That is, warrantlessly entering an individual's property to abate a public nuisance is only *per se* reasonable if two requirements are met: (1) the procedures employed to declare the property a nuisance comports with due process and (2) the abatement does not involve encroaching on an area in which the Plaintiff maintains a Fourth Amendment privacy interest. The *Keene Grp.* court recognized as much, as it first rejected the plaintiff's due process claim because they were "provided with 'notice reasonably calculated, under all the circumstances,' of the pendency of the condemnation proceedings." *Id.* (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). If Defendants are correct that following proper nuisance declaration procedures rendered the subsequent abatement *per se* reasonable under the Fourth Amendment, the *Keene Group* court could have ended its analysis there. Instead, it proceeded to determine the "warrant requirement does not apply in this case" where the plaintiff had "no reasonable expectation of privacy" in a property for which there was "suggestion [the plaintiff] ever occupied the property or attempted to prevent others from accessing it." *Id.* at 315–17.

True, *Gammarino* cited *Kenne Group* for the unqualified proposition that "seizing property that has been declared a public nuisance is reasonable, provided that the property owner has been provided constitutionally adequate due process" without regard to whether the abatement involved

an invasion of a constitutionally protected privacy interest. *Gammarino*, 2025 WL 674222, at *3 (citing *Keene Grp.*, 998 F.3d at 317). However, the Court finds this omission to be a result of the factual similarities between the plaintiffs in *Keene Group* and *Gammarino* rather than a statement generally applicable Fourth Amendment principles, as both cases involved investment properties which plaintiffs failed to properly maintain and never occupied. *See id.* at *1; *Keene Grp.*, 998 F.3d at 315 ("[T]he plaintiff retained little or no reasonable expectation of privacy in their dilapidated, uninhabited rental properties after the City had entered orders declaring them an urban nuisance, and the owner had failed to abate the code violations." (citation modified) (quoting *Freeman*, 242 F.3d at 652)). Thus, the Court is persuaded that a warrantless entry to abate a public nuisance only *per se* reasonable when the abatement declaration procedures comport with constitutional due process *and* the individual retains no constitutional privacy interest in the area in which the nuisance resides. In any event, *Keene Group*, including its separate treatment of the due process and privacy interest questions, is binding on this court—*Gammarino* is not. *See Keahey v. Marquis*, 978 F.3d 474, 480 (6th Cir. 2020) ("[T]he paper of unpublished decisions cannot escape the scissors of published opinions on point.").

As a result, Defendants cannot succeed on their Motion with respect to the May 30, 2023, entry onto Plaintiff's property because, as explained *supra*, they have failed to demonstrate as a matter of law that Plaintiff retained no constitutional privacy interest in the area of his property Defendants entered to inspect and seize the vehicles. This conclusion precludes summary judgment for Defendants even if the procedures employed to declare Plaintiff's van and boat "junk vehicles" and nuisances comported with constitutional due process requirements. The Court thus takes no position on the due process question.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants' Motion for Summary Judgment (Doc. 62) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Plaintiff's Motion for Leave to File Sur-Reply (Doc. 68), be and the same hereby is, DENIED AS MOOT;

FURTHER ORDERED that Plaintiff's Motion to Admit (Doc. 69), be and the same hereby is, DENIED AS MOOT as the Court finds the evidence discussed herein is properly considered under Federal Civil Rule 56. To the extent Plaintiff seeks a determination that such evidence shall be admissible at trial, such determination would be premature.

s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: August 24, 2026